[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
AUGUST 14, 2001
THOMAS K. KAHN
CLERK

No. 99-13214

D. C. Docket No. 99-00053-CR-ORL-22B

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

AARON CAMACHO,

Defendant-Appellant.

Appeal from the United States District Court
for the Middle District of Florida

**(August 14, 2001)**

Before TJOFLAT, DUBINA and DUHE*, Circuit Judges.

_____
*Honorable John M. Duhe, Jr., U.S. Circuit Judge for the Fifth Circuit, sitting by designation.

DUBINA, Circuit Judge:

Appellant Aaron Camacho ("Camacho") pled guilty to conspiracy to possess with intent to distribute lysergic acid diethylamide ("LSD") and methamphetamine, in violation of 21 U.S.C. § 846. The district court sentenced him to 105 months imprisonment; he then perfected this appeal. We affirm in part and vacate in part.

## I. BACKGROUND

In late 1998 and early 1999, the Drug Enforcement Agency ("DEA") obtained information through an undercover agent that a group of conspirators were attempting to set up a methamphetamine manufacturing lab in the Middle District of Florida. While the conspirators made arrangements to obtain the chemicals, warehouse, and materials for the lab, an undercover DEA agent purchased liquid LSD and LSD on blotter paper from Trevor Ritsema ("Ritsema") and Brandon Quandt ("Quandt"), who had obtained it from Jeremiah Swartz ("Swartz") and Eileene Kenlee Godwin ("Godwin") through Eric Neuf ("Neuf").

After the undercover agent had purchased various quantities of LSD several times, Ritsema, Quandt, Swartz, Godwin, Neuf and others were arrested. After their arrests, Swartz and Godwin identified Ryan Moreno ("Moreno") as their LSD source. After his arrest, Moreno told agents that Camacho was his source of supply.

2

Subsequently, agents learned that Camacho was storing drugs in a locker at a bowling alley. Police officers arrested him as he attempted to retrieve items from the locker. The officers found liquid LSD, dry LSD, crystal mescaline, Ecstacy pills, and $40,000 in the locker and on Camacho.

Camacho later pled guilty to conspiracy to possess with intent to distribute LSD and methamphetamine. At sentencing, Camacho's attorney maintained that because Moreno had mixed the crystal LSD with ethanol, Camacho should be held accountable for only 16 grams. In response, the government presented DEA Agent Timothy Jones's ("Jones") testimony that Camacho had supplied all of the LSD that the various dealers had sold to the undercover agent during the investigation. Moreno told Agent Jones that Camacho regularly sold him either a half a gram or a whole gram of LSD in either powder or crystal form, at a price of $10,000 per gram. After Moreno paid for the LSD, Camacho converted it into a highly concentrated liquid, which Camacho gave to Moreno. The liquid LSD that Camacho provided in this way was not ready for use but could be diluted up to four times to obtain a normal dosage unit.

After considering the evidence, the district court ruled that, for the purposes of determining Camacho's base offense level under the United States Sentencing Guidelines ("U.S.S.G."), Camacho was accountable for distributing 180 grams of

liquid LSD.[1]  Camacho argues that the district court erred by including the entire weight of the liquid solution, as opposed to the weight of the pure LSD alone, in calculating the total weight of the LSD for which Camacho was accountable.

Camacho also maintains that he was entitled to a two level reduction in his base offense level pursuant to the safety valve provision contained in U.S.S.G. § 5C1.2.  The district court declined to apply the safety valve, agreeing with the government that Camacho did not qualify for safety valve treatment because he had refused to reveal his source of the LSD.

## II.  ISSUES

(1) Whether the district court erred in determining Camacho's base offense level.

(2) Whether the district court erred by not applying a two level safety valve reduction because Camacho did not truthfully provide the government with all of the information he had concerning the offense.

## III.  STANDARDS OF REVIEW

This court reviews a district court's factual determinations and subsequent denial of "safety valve" relief for clear error.  *United States v. Cruz*, 106 F.3d 1553,

---

[1]  In addition, the district court ruled that Camacho was accountable for distributing 30 grams of dry LSD on blotter paper or cereal carriers.  Camacho does not dispute the calculation of this amount.

1557 (11ᵗʰ Cir. 1997).  This court reviews the district court's application of the Sentencing Guidelines *de novo* and its findings of fact for clear error.  *United States v. Trujillo*, 146 F.3d 838, 847 (11ᵗʰ Cir. 1998).[2]

## IV.  DISCUSSION

Looking to the second issue first, Camacho's counsel at oral argument conceded that the district court did not err in determining that Camacho failed to qualify for safety valve consideration.  Because of counsel's concession and our conclusion that the district court correctly determined that Camacho did not qualify for safety valve treatment because of his refusal to reveal his source of the LSD, we affirm that part of Camacho's sentence.

We now turn our attention to the first issue presented in this appeal – whether the district court erred in determining Camacho's base offense level.

Unless otherwise specified, the weight of a controlled substance set forth in U.S.S.G. § 2D1.1(c) refers to the weight of any "mixture or substance" containing a detectable amount of the controlled substance.  U.S.S.G. § 2D1.1(c) (A).  While the terms "mixture" and "substance" are not defined in the Guidelines, these terms

---

[2]  The government's argument that the standard of review is plain error is incorrect because the record reflects that Camacho raised the arguments contained in his appellate brief in the district court.  Specifically, Camacho argued, both in his objections to the pre-sentence investigation report ("PSI") and at sentencing, that he should not be held accountable for more than 16 grams of raw LSD.

generally include the carrier medium that contains the controlled substance. *See*

*Chapman v. United States*, 500 U.S. 453, 461-68 (1991). More specifically, the

Supreme Court has held that for the purpose of determining a mandatory minimum

statutory sentence in a case involving LSD contained in a carrier medium, the

phrase "mixture or substance" means that the entire weight of the carrier medium

for the LSD should be included in calculating the total weight of LSD. *Id.*

However, for the purpose of determining a base offense level in a case where

LSD is contained in a carrier medium, the weight of the medium is not used, but

rather, each dose of LSD is treated as equal to 0.4 milligrams. U.S.S.G. §

2D1.1(c)(H). Yet, LSD contained in a liquid solution, such as the LSD in the case

at hand, poses a different problem because a liquid solution containing LSD is not

considered a carrier medium. U.S.S.G. § 2D1.1(c), comment. (n.16).[3] Therefore,

as a matter of first impression in this circuit, we must determine how to weigh

liquid LSD for the purpose of determining a base offense level under the

Guidelines. We conclude that the weight of the pure LSD alone should be

employed to ascertain the appropriate base offense level.

In reaching this conclusion, we look first to the Guidelines, which provide

---

[3] Commentary in the Sentencing Guidelines is to be given the same force and effect as the Guidelines language itself unless the Commentary "violates the Constitution or a federal statute, or it is inconsistent with, or a plainly erroneous reading of, that guideline." *Stinson v. United States*, 508 U.S. 36, 38 (1993).

6

that "[i]n the case of liquid LSD (LSD that has not been placed onto a carrier medium), using the weight of the LSD alone to calculate the offense level may not adequately reflect the seriousness of the offense. In such a case, an upward departure may be warranted." U.S.S.G. § 2D1.1(c), comment. (n.16).[4] In light of this authority, the question then becomes what exactly constitutes "liquid LSD."

The Fourth Circuit squarely addressed this very question in *United States v. Turner*, 59 F.3d 481 (4th Cir. 1995). In *Turner*, the court began its analysis by noting that LSD exists in several forms as it moves from production to distribution to consumption. *Id.* at 485. In its pure form, LSD is a dry, crystalline powder that is potent in very small dosages. Because of its potency in extremely small amounts, LSD is commonly combined with a liquid solvent, such as alcohol, in order to facilitate handling of the drug. This liquid form is unstable, however, because the solvent tends to evaporate. Drug traffickers have therefore employed various means to capture the LSD in a form that is stable over a long period of time. Traffickers typically place or spray the LSD solution onto a carrier medium such as blotter paper, gelatin, or sugar cubes. When placed on such a carrier medium, the liquid solvent evaporates and the pure LSD is absorbed into the medium. Users consume the drug either by directly ingesting the carrier medium,

---

[4] *See supra* note 3.

by dropping the medium into a beverage to release the drug, or by licking the medium until the drug is released.

Considering the various forms of LSD during its marketing, the Fourth Circuit concluded that the use of the term "liquid LSD" in the Guidelines referred to pure LSD dissolved or suspended in a liquid solvent, which is the form of LSD at issue in the present case. *Turner*, 59 F.3d at 485. The court further determined that by virtue of defining liquid LSD as "LSD not placed onto a carrier medium," U.S.S.G. § 2D1.1(c), comment. (n.16), the Sentencing Commission did not contemplate liquid solvents to be LSD carrier mediums for Guidelines purposes. *Turner*, 59 F.3d at 485. Based on that determination, the court held that in cases involving liquid LSD, the weight of the pure LSD alone should be used to calculate the defendant's base offense level under the Guidelines. *Id.* at 486. The court stated that the plain language of the Guidelines supported this interpretation because the Guidelines specifically defined "'liquid LSD'" as "'LSD that has not been placed onto a carrier medium.'" *Id.* (quoting U.S.S.G. § 2D1.1(c), comment. (n.16)). Because this definition is clear and unambiguous, the court held that U.S.S.G. § 2D1.1(c) comment. (n.16) excluded liquid solvent in which pure LSD is suspended or dissolved from its conception of "carrier medium," which rendered the 0.4 mg conversion factor inapplicable to liquid LSD. *Id.*

Beyond the plain language of the text, the Fourth Circuit found support for using the weight of the pure LSD alone in determining a defendant's base offense level from the fact that § 2D1.1(c), comment. (n.16) expressly authorized an upward departure because "'using the weight of the LSD alone to calculate the offense level may not adequately reflect the seriousness of the offense.'" *Turner*, 59 F.3d at 486 (quoting U.S.S.G. § 2D1.1(c), comment. (n.16)). The court held that this express authorization for upward departures would be illogical if the amendment intended courts to determine the offense level by using the entire weight of the pure LSD and the liquid solvent. *Id.*

Although differing on the precise methodology to be employed, other circuits agree that the full weight of liquid LSD is not to be included in calculating drug quantities under the Guidelines. *U.S. v. Sia*, No. 96-1808 (1st Cir. 1996) (unpublished opinion); *United States v. Ingram*, 67 F.3d 126, 128 (6th Cir. 1995); *see also U.S. v. Jordan*, 842 F. Supp. 1031, 1033-34 (M.D. Tenn. 1994) (finding that liquid solvent weight should not be used in determining the weight of liquid LSD). We agree with our sister circuits, particularly the Fourth Circuit, and hold that the weight of the pure LSD alone should have been used to calculate Camacho's base offense level under the Guidelines. For that reason, Camacho is due to be resentenced so that the district court can determine the amount of pure

9

LSD involved and then consider whether an upward departure to reflect the seriousness of the offense is necessary. We therefore vacate Camacho's sentence and remand this case to the district court for further proceedings consistent with this opinion.

AFFIRMED in part, VACATED in part, and REMANDED for resentencing.